

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | )<br>)<br>) |
| v. | ) No. 18-cr-391<br>) |
| JOSE SEGOVIANO, JR., | ) Hon. Charles R. Norgle<br>) |
| Defendant. | )<br>) |

## OPINION AND ORDER

Defendant Jose Segoviano, Jr. ("Defendant") is charged in a two-count indictment with knowingly and intentionally possessing with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Defendant now moves to suppress his statements and all evidence uncovered by agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF") during a search of his apartment located at 3106 N. Cicero Ave., in Chicago, Illinois. The parties do not contend that an evidentiary hearing is required, except if the Court's holding is premised on whether Defendant revoked his second consent to search.[1] Dkt. 33, p.1; Dkt. 43, p. 2. The Court does not find it necessary to address the issue of revoked consent to resolve Defendant's motion. Rather, for the reasons set forth below, Defendant's motion is denied.

### I. BACKGROUND

On May 6, 2018, ATF agents were searching for Ernesto Godinez ("Godinez"), an individual charged with shooting an ATF agent.[2] The agents searching for Godinez were using cell phone location data which led them to Defendant's apartment building. While surveilling the apartment building, agents

---

[1] Two searches occurred during Defendant's interaction with the federal agents. The first search was a protective sweep conducted by agents, which Defendant consented to. The second search occurred during the interview between agents and Defendant—which Defendant consented to, but now claims to have later revoked his consent. The second search is the search at issue.

[2] See United States v. Godinez, 18 CR 278 (charging 18 U.S.C. § 111(a) and (b)).

observed Godinez's girlfriend leave the apartment building. After seeing Godinez's girlfriend leave, agents entered the vestibule of Defendant's building and began climbing a staircase which led into Defendant's apartment. Agents announced their presence to Defendant and informed him that they were searching for Godinez. Agents requested to enter Defendant's apartment to look for Godinez; Defendant consented. While the agents conducted a protective sweep of the apartment, Defendant was detained in handcuffs. After the agents conducted the protective sweep and while Defendant sat handcuffed at his kitchen table, agents questioned him about Godinez. Defendant asked if he was under arrest, at which point agents told him he was being detained.

Agents interviewed Defendant about his interactions with Godinez. Defendant estimates that he was questioned by agents between twenty to thirty minutes and was handcuffed for most of that time. Defendant told agents that he had communicated with Godinez that day by telephone and social media, and earlier on May 6, 2018, Godinez had been at Defendant's apartment. Additionally, the agents found a Kia Sorrento in Defendant's garage, which based on surveillance footage, the agents believed was associated with Godinez. Once Defendant revealed that Godinez had been in the apartment earlier that day, agents asked Defendant if they could search his cell phone and residence for information pertaining to Godinez's whereabouts.

Defendant verbally agreed to the second search of his residence; however, before the search Defendant disclosed he had marijuana in his bedroom and that there was cocaine in the apartment. Defendant also told the agents that he had a firearm in his bedroom and possessed a Firearm Ownership Identification card. Consequently, agents told Defendant that because he had cocaine the agents could obtain a search warrant. Eventually, Defendant reaffirmed his consent by providing verbal and written consent to search his cell phone and residence. He signed two "Consent to Search" forms: the first indicated that agents could search his cell phone and the second indicated that agents could search his garage and entire residence, except for his mother's bedroom.

2

During the search of his residence, some agents remained with Defendant and questioned him further about details on Godinez.³ The ATF agents did not provide Defendant his Miranda warnings. The search concluded with the agents recovering four firearms, 95 grams of cocaine, marijuana, approximately $1,000 in cash, and over 100 rounds of ammunition. One firearm, a Taurus .380 pistol, had an obliterated serial number. Defendant now moves to suppress all evidence obtained from the search of his apartment and all statements he made to the law enforcement agents.

## II.   ANALYSIS

### A.   Federal Agents Conducted a Lawful Terry Stop

Defendant argues that the agents conducted an unlawful Terry stop that tainted his consent to search his residence and cell phone. According to Defendant, the unlawful Terry stop led to a Miranda-less interrogation, which coerced Defendant into consenting to a search of his apartment and cell phone. To support his argument, Defendant relies on United States v. Lopez, which held a defendant's consent to search cannot be considered voluntary when the defendant is being detained in violation of the Fourth Amendment. 907 F.3d 472, 487 (7th Cir. 2018).

Individuals are protected from unreasonable searches and seizures. U.S. Const. amend. IV. In limited circumstances, however, law enforcement officers may stop and briefly detain a person for investigative purposes without running afoul of the Constitution, if the officers have a reasonable suspicion of criminal activity that is supported by specific and articulable facts. Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Ruiz, 785 F.3d 1134, 1141 (7th Cir. 2015). The reasonable suspicion standard is less demanding than probable cause. Ruiz, 785 F.3d at 1141; see also Jewett v. Anders, 521 F.3d 818, 823 (7th Cir. 2008) ("Reasonable suspicion is more than a hunch but less than probable cause and 'considerably less than preponderance of the

---

³ Segments of this interview were audio recorded by ATF agents. The Court instructed the government to transcribe the audio recording and provide a copy to the Defendant and his counsel. Dkt. 38.

3

evidence.'") (citation omitted). Reasonable suspicion of criminal activity is measured objectively based on the totality of the circumstances at the time of the Terry stop, which includes the circumstances known to the officer at the time of the stop, the experience of the officers, and the behavior and characteristics of the suspect. United States v. Bullock, 632 F.3d 1004, 1012 (7th Cir. 2011). Reasonable suspicion "can arise from behavior that may in other circumstances be considered innocent; in other words, context matters." Ruiz, 785 F.3d at 1141 (internal quotations omitted). While an investigatory stop requires only reasonable suspicion, probable cause may be required when a stop evolves into a *de facto* arrest, such as when "police restraint is so intrusive that, while not technically an 'arrest,' it may be 'tantamount' to an arrest." United States v. Tilmon, 19 F.3d 1221, 1224 (citing Dunaway v. New York, 442 U.S. 200, 212–16 (1979)).

Defendant argues that he was unlawfully detained, in violation of his rights against unlawful seizure, when agents handcuffed him and questioned him at his dining room table. In addition, Defendant provides an alternative argument that, regardless of the Court's ruling on the lawfulness of the Terry stop, Defendant's prolonged detention requires the evidence to be suppressed. Dkt. 33 at 6-8. According to Defendant, agents "effectively arrested" him without probable cause or reasonable suspicion. Id. at 3. To determine if Defendant was unlawfully detained outside the permissible bounds of a Terry stop, the Court is required to examine: "(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts." Bullock, 632 F.3d at 1012.

The government contends, and the Court agrees, that the agents had reasonable suspicion to detain Defendant for aiding and abetting a fugitive. Dkt. 43 at 3; see also 18 U.S.C. § 1071. The facts presented by the government are 'specific and articulable.' Bullock, 632 F.3d at 1012 (citation and quotations omitted). Acting on an arrest warrant for Godinez, who is charged with forcible assault of a federal employee, agents used cellphone location data to track him to Defendant's apartment building.

4

While surveilling the area, agents observed a woman known to them as Godinez's girlfriend and his child's mother, leave the apartment building. Godinez's girlfriend was detained by agents allowing them to gather further information, which led to agents deciding to secure Defendant's apartment in an attempt to locate Godinez. [33] Ex. 4 at ¶¶ 3-4.

When the agents detained Defendant, given the totality of the circumstances, there was reasonable suspicion that Defendant was engaged in criminal activity. See United States v. Lawshea, 461 F.3d 857, 859 (7th Cir.2006) ("[C]ourts examine the totality of the circumstances known to the officer at the time of the stop."). At the time Defendant was detained, agents were attempting to apprehend Godinez, a man charged with shooting another ATF agent in the face. See 18 CR 278, Dkt. 1 at ¶ 4. The agents were operating under the facts known to them at the time, e.g., that Godinez might have been in the area. It is reasonable to infer, that when agents found Defendant in the same area they believed Godinez to be in, the agents believed Defendant posed a serious threat to them and others given the protentional dangers involved with effectuating an arrest on a suspected gunman. See Howell v. Smith, 853 F.3d 892, 898 (7th Cir. 2017) (recognizing the possibility of the presence of a weapon as one instance in the limited circumstances in which the use of handcuffs is appropriate during a Terry stop); United States v. Stewart, 388 F.3d 1079, 1085 ("To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of Terry.") (internal quotations and citation omitted). Therefore, the agents had reasonable suspicion to lawfully detain Defendant.

### B. Federal Agents did not Unlawfully Extend the Terry Stop

Next, Defendant argues that agents unlawfully extended his detention beyond the original justification for his stop. Defendant relies on Lopez, which held the defendant did not voluntarily consent to his house being searched because at the time the government requested consent, defendant was unlawfully detained beyond the original justification for a Terry stop. 907 F.3d at 487. Thus, the court

5

in Lopez held that the heroin and a firearm recovered in the search of the defendant's house were inadmissible. Id.

According to Defendant, his extended detention functioned as an unlawful arrested without probable cause. The Court disagrees. Defendant was neither illegally arrested nor does Lopez support his arguments. In Lopez, the police conducted a Terry stop on the defendant premised on an unsubstantiated tip that he supplied cocaine, and a police officer's 'hunch' that Lopez's shopping bags contained drugs. Id. at 476, 481. However, because the police officers failed to pursue "even a modicum of additional investigation" to substantiate the tip, the court concluded that the police unlawfully stopped Lopez. Id. at 482.

Instead of ending its analysis at the unlawful stop, the court in Lopez continued with the law enforcement officers' subsequent conduct, which further distinguishes Lopez form this case. After frisking Lopez and finding neither weapons nor contraband, the police requested consent to search his vehicle, Lopez obliged. And again, the police found no evidence of criminal activity. Police persisted by escorting Lopez back to his garage, telling him he was not under arrest and did not have to answer their questions, and then requested consent to search his garage. Id. at 477. The police, again, found no evidence of criminality. Finally, the police requested to search Lopez's house, at which point after further questioning, Lopez directed the police to his heroin and a firearm. Id. Based on the intervening events between the initial stop and the eventual uncovering of illicit materials, the court held that even if the initial stop was justified, the justification to detain defendant dissipated when the police failed to find evidence of criminal activity in defendant's garage. Id. at 486. Therefore, the police had violated Lopez's Forth Amendment rights warranting the suppression of unlawfully obtained evidence. Id. at 487.

The facts in Lopez are distinguishable from this case. Unlike the defendant in Lopez, Defendant was lawfully detained for the entirety of his interactions with law enforcement. See United States v. Shoals, 478 F.3d 850, 853 (7th Cir. 2007) (finding Terry stop was not converting into a full custodial

6

arrest when police drew their weapons and handcuffed the defendant given the inherent danger of the encounter). The "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). "There is no rigid time limit placed on Terry stops; common sense and ordinary human experience must govern over rigid criteria." Bullock, 632 F.3d at 1014 (citing Sharpe, 470 U.S. at 685) (internal quotations omitted). "For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." Id. at 1015 (citation omitted).

When agents initially detained Defendant, they had reasonable suspicion to do so given the information available to them at the time and the possibility of violence. See Howell, 853 F.3d at 898. Agents detained Defendant in handcuffs and then requested consent to search the premises for Godinez.[4] Still in handcuffs, Defendant sat at his dining room table while agents searched the premises for evidence pertaining to Godinez's location, including the backyard and detached garage. Unknown to the agents at the time of the search were important details essential to their safety, such as whether Godinez was hiding in the apartment, if Godinez was coming back to the apartment, and to what extend Defendant was aiding Godinez, e.g., warning him or destroying evidence.

During the second search, agents asked him questions about Godinez, which Defendant estimated lasted for approximately twenty to thirty minutes. Dkt. 33 at 2; Id., Ex. B. The agents recorded their interview with Defendant, which was specific to the questioning about Defendant's interactions with Godinez, and the length of the interview was consistent with law enforcement needs. See United States v. Bullock, 632 F.3d 1004, 1011 (7th Cir.2011) ("[L]ength of detention—thirty to forty minutes—was

---

[4] The parties do not dispute that Defendant provided initial consent to search. Dkt. 33 at 2. ("[T]here is no dispute that agents conducted an initial sweep for a fugitive, whom they did not find and that any initial consent given was limited to looking for a fugitive in places a human may hide."); Id., Ex. 4 ¶ 6 ("[F]ederal agent asked [Defendant] if there was anybody else in the residence. [Defendant] said there was not anybody else but allowed agents to search the apartment for additional people.").

7

limited to the legitimate needs of the officers in conducting further investigation"); see also United States v. Adamson, 441 F.3d 513, 521 (7th Cir.2006) (twenty-five minute delay reasonable to investigate whether defendant was taking part in drug activity in hotel room given number of subjects and their reluctance to reveal their names and why they were at motel); Robinson, 30 F.3d at 784 (twenty-minute detention reasonable while officers questioned suspects about their identities and activities, contacted other officers to inform them of the encounter, and made a number of calls to verify co-defendant's identity). Moreover, Defendant willingly provided answers to the agents' questions, which were designed to gather more information about Godinez. See United States v. Childs, 277 F.3d 947 (7th Cir.2002) ("Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention."); Dkt. 43 Ex. B.

Furthermore, agents uncovered evidence associated with Godinez during the initial search that justified prolonging Defendant's detention. In Defendant's garage, agents found a white Kia Sorrento that was the same color, make, and model of SUV that surveillance cameras recorded Godinez use in the same location and within 30 minutes of the shooting of the ATF agent. See 18 CR 278, Dkt. 1; Dkt. 43 at 8. Defendant also told agents that Godinez had been in his apartment earlier that same day. Dkt. 33 at 2.

The Court concludes that Defendant was lawfully detained, and the detention "last[ed] no longer than [was] necessary to effectuate its purpose." Lopez, 907 F.3d at 486 (citing Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015)). During Defendant's detention, agents discovered new evidence related to Godinez, some of which was provided by Defendant himself—necessitating additional time to gather more information about Godinez. Also, the Court concludes that the degree of intrusion the agents used in detaining Defendant was reasonable. Notwithstanding the information which prompted the agents' request to search Defendant's apartment, Defendant told the agents that Godinez had been in his apartment earlier that day, agents found what they believed to be a vehicle associated with Godinez

8

in Defendant's garage, and Defendant participated in an interview in which he provided details about his interactions with Godinez. The additional evidence found by the agents, and provided by Defendant, justified prolonging his detention. See United States v. Fadiga, 858 F.3d 1061, 1063 (7th Cir. 2017) (detention extended because of defendants' potentially incriminating statements and uncovered evidence); United States v. Goodwin, 449 F.3d 766, 772 (7th Cir.2006) (holding that duration of Terry stop was reasonable when the defendant "was…the co-author of the prolongation that is the fulcrum of his Fourth Amendment claim").

Moreover, even though Defendant's detention was extended and he remained in handcuffs for most of it, the Court finds nothing unreasonable about this situation. See Matz, 769 F.3d at 525 (holding that given the circumstances of the stop, it was reasonable for officers to handcuff individual "while they controlled the situation" and accounted for individuals at the scene); Bullock, 632 F.3d at 1016 (holding that it was reasonable for officers to place the defendant in handcuffs and *in a squad car* while pursuing investigation). Accordingly, Defendant's motion to suppress the search of his residence based on a violation of his Fourth Amendment rights is denied.

### C. Miranda Warnings were not Required Because Defendant was not in Custody

Next, Defendant argues that agents questioned him in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and therefore his incriminating statements and consent to search his premises must be suppressed. A person is "in custody" for Miranda purposes "if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest." Patterson, 826 F.3d at 455 (internal quotation marks and citation omitted). "Custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." United States v. Pelletier, 700 F.3d 1109, 1114 (7th Cir. 2012) (citing Howes v. Fields, 565 U.S. 499, 508-09 (2012). "Even if the subject would not have felt free to leave, [a court] must still ask an additional question: whether the relevant environment presents the same inherently coercive pressures as the type of station

9

house questioning at issue in Miranda." Id. at 1114 (internal quotations omitted) (citing Howes, 565 U.S. at 509). Put differently, the restriction of a defendant's ability to move about is "only a necessary and not a sufficient condition for Miranda custody." United States v. Khan, No. 15-CR-00286, 2017 WL 2362572, at *11 (N.D. Ill. May 31, 2017) (quoting Shatzer, 559 U.S. at 112).

Defendant was not in the type of custody that requires Miranda protections. As explained above, the federal agents conducted a Terry stop on Defendant, during which he voluntarily consented to the initial search of the premises. Dkt. 33 at 2; Id., Ex. 4 ¶ 6. During the second search, Defendant was detained at his dining room table, in his apartment, an environment absent "the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes, 565 U.S. at 510. He was asked questions about Godinez, to which he responded cooperatively and at times even volunteered information. Dkt. 43, Ex. B. Throughout the interview, which agents told Defendant was voluntary, there were numerous instances of Defendant volunteering information. Dkt. 33 at 11; Id., Ex. B ¶ 2. Below is an example of Defendant voluntarily providing information to the agents during the interview.

> [Agent] Q: All right, so you called him at five, fifty-seven on the Fourth.
> [Defendant] A: Yeah. He, he put he was on his way to drop his friend off on Snapchat. He put was cruising. He's like, I'm on my way to take my friend on vacation. And then, uh, that's when I hit him up.
> [Agent] Q: Yeah.
> [Defendant] A: And, and then I told him, I was like, "What you want?" He's like, "No, I just wanna cruise. I'm taking this girl here." And then, I don't know what I said. I might've just said, like "All right, []. Why didn't you hit me up?" And then, and then he told me, "I'll hit you up later in the morning in AM for breakfast." I was like, "All right, cool. Hit me up." And then, then later on he hit me up again saying, "Hey, I'mma go by. I'll be by a little later." And then, I'm pretty sure after that is when he appeared the first time. And then he told me, "You know what? I ain't got time to chill right now. I'm gonna go to the doctor—take her to the doctor's office."

Dkt. 43, Ex. B at 4. Furthermore, not only was Defendant willing to provide long-narrative answers to questions, he did not hesitate in assisting the agents in searching his house:

> [Agent] Q: Uh, where are the keys to the lock pad?
> [Defendant] A: Oh, um, in my top drawer, there's a keychain. It has all my keys on it.
> [Agent] Q: Not these keys?

10

> [Defendant] A: No, that one opens, um.
> [Agent] Q: In your dresser?
> [Defendant] A: Yes, in the dresser. In the top dresser drawer there should be a keychain with all of them. The black one, the black one over there.
> [Agent] Q: All right.
> [Defendant] A: With, uh, the one under the T.V.

Id. at 3, 6. Defendant does not allege, nor does the Court find, that during the interview agents used a tone of voice or a threatening manner meant to compel compliance. Patterson, 826 F.3d 455.

Defendant contends that the presence of seven armed federal agents led him to believe that he was in custody. For support, he relies on United States v. Borostowski, 775 F.3d 851 (7th Cir. 2014); although the facts in Defendant's case vaguely resemble those in Borostowski, there are significant differences. In Borostowski, thirteen law enforcement officers executed a search warrant to search for child pornography in Borostowski's parents' house. The defendant answered the door and was handcuffed, extracted from the house, and kept outside under guard by an agent for twenty-five minutes. While outside, the defendant yelled out to his sister that he needed an attorney. After the search, agents took the defendant back into the house and into a small upstairs bedroom where an armed agent prevented the defendant from leaving by standing between him and the door. The agents proceeded to question him for three hours, after which the agents restrained his arms and legs and took him to FBI headquarters. The defendant was eventually placed under arrest and taken to jail.

Here, the facts are significantly different and lead to the conclusion that a reasonable person would not have believed that they were in custody. First, Defendant consented to the initial search of his house, Dkt. 33 at 2; Id., Ex. D ¶ 6, and was detained in a stairwell for approximately fifteen minutes during the search. Dkt. 34, Ex. C. Second, unlike Borostowski who was confined to a small bedroom, agents brought Defendant back into the house after completing the search, and interviewed him at his dining room table. Defendant states there were seven armed federal agents but does not allege that the officers unholstered them or used their weapons in any way, which undercuts his position. See Patterson, 826 F.3d at 456–57; United States v. Littledale, 652 F.3d 698, 702 (considering that while the officers

carried holstered weapons there was no display of force or physical touching). Third, Defendant was interviewed for thirty minutes, a significantly shorter time than the three hours Borostowski endured. [34] Ex. C, ¶ 5. Fourth, during the interview Defendant signed two consent to search forms allowing the agents to search his cell phone and his house (except for his mother's room) for additional evidence regarding Godinez's whereabouts. In addition, Defendant's actions demonstrate willingness to cooperate as opposed to Borostowski yelling out to his sister to get an attorney. Fifth, at the end of the interview, unlike in Borostowski, agents left Defendant at his house, even after finding marijuana, cocaine, and a handgun with an obliterated serial number. See Howes, 565 U.S. at 509; Patterson, 826 F.3d at 458 (no immediate arrest after questioning weighs against defendant being in custody). Finally, the custodial nature did not exist when Defendant made his incriminating statements, whereas there was a "strong police presence" which did not dissipate in Borostowki. See United States v. Ramos-Guerrero, 145 F. Supp. 3d 753, 763 (N.D. Ill. 2015) (distinguishing similar fact pattern from that found in Borostowski and concluding defendant was not in custody).

As discussed above, Defendant's initial detention was justified given the circumstances and risk to officer safety. See Howell, 853 F.3d at 898. After the search, and at some point during the interview, agents removed the handcuffs and informed Defendant he was not under arrest. Dkt. 34, Ex. C ¶ 3. The transcript of the interview demonstrates Defendant's willingness to cooperate, Dkt. 43, Ex. B, and Defendant admitted to having marijuana and cocaine in his apartment before giving the agents consent to search his house. Id. at ¶¶ 5-6.

In sum, the totality of the circumstances indicate that Defendant was not in custody. He was detained during a lawful Terry stop. Defendant was not placed under arrest. The length of questioning was reasonable given the need to find an armed fugitive. The interaction with agents, which took place in his home, "had no indicia of compulsion or government overreaching, such as violence, threats, promises, or unduly protracted interrogation." Patterson, 826 F.3d at 459 (citation omitted).

12

### D. Defendant was not Unlawfully Interrogated

Next, Defendant argues that the consent he provided agents to conduct a second search of his house was a product of an unlawful interrogation. This argument fails. The Court held *supra* that Defendant was not subjected to a custodial interrogation. More importantly, a consent to search is not an incriminating statement protected by Miranda. United States v. Knope, 655 F.3d 647, 654 (7th Cir. 2011); see also United States v. Renken, 474 F.3d 984, 988 (7th Cir. 2007) ("[T]he failure to give Miranda warnings does not require the exclusion of evidence collected after a defendant gives a voluntary consent to search."). That said, Defendant raises the issue of the scope and purpose of the second search. The government contends that the agents requested consent to search for the limited purpose of obtaining additional evidence related to Godinez. Dkt. 43 at 18. Defendant asserts that the agents wanted him to consent to a search for drugs. Dkt. 34, Ex. C ¶ 5. This distinction—whether the second search was premised on looking for drugs or for evidence related to Godinez—is inconsequential. Rather, what ultimately matters is that Defendant voluntary consented to the search.

"The voluntariness of a consent to search is a factual determination." United States v. Contreras, 820 F.3d 255, 269 (7th Cir. 2016) (citing Ohio v. Robinette, 519 U.S. 33, 40 (1996)). Voluntariness "must be 'determined from the totality of all the circumstances.'" Birchfield v. North Dakota, 136 S. Ct. 2160, 2186 (2016) (quoting Schneckloth, 412 U.S. at 227)); see also Thurman, 889 F.3d at 367. "The government bears the burden of showing voluntariness by a preponderance of the evidence." United States v. Hicks, 650 F.3d 1058, 1064 (7th Cir. 2011). When determining the voluntariness, a court uses the following nonexeclusive factors: "(1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether he was in custody when he consented." Id.

13

First, Defendant was thirty-seven years old with a GED and was capable of intelligently interacting with the agents. Dkt. 43 at 17; Id., Ex. B. Second, although Defendant was not advised of his Miranda rights, agents informed him that the interview was voluntary, and he was not required to answer their questions. Id. at 17-18; Dkt. 33, Ex. B. The agents' failure to provide Miranda warnings before requesting consent to search is not fatal. See Knope, 655 F.3d at 654 ("A consent to search is not an interrogation within the meaning of Miranda."). Moreover, Defendant signed two ATF consent to search forms, which weighs in favor that Defendant was appraised of his constitutional rights. United States v. Drayton, 536 U.S. 194, 206 (2002) ("[K]nowledge of the right to refuse is taken into account."). The forms provided that Defendant had the right to refuse consent, that he understood contraband found during the search could be seized and used against him, that he could consult with an attorney, and that he could withdraw consent before the search's termination. Dkt. 43, Ex. B. When Defendant signed the forms, he confirmed his consent was "given voluntarily without promises, threats, coercion or force of any kind whatsoever." Id. Third, Defendant was detained and interviewed for approximately thirty minutes, during which his handcuffs were removed, and he consented to a second search of his apartment. Fourth, there is no indication that Defendant was subjected to "the sort of repetitive psychological harassment" that would weigh in his favor. United States v. LaGrone, 43 F.3d 332, 334 (7th Cir. 1994); see also United States v. Medina, 2011 WL 887752, at *9 (E.D. Wis. Mar. 11, 2011) (stating that "repetitive and prolonged" questioning of defendant over an hour-and-a-half not sufficient to weigh against finding of voluntary consent to search, where questioning was "not overly zealous or harassing in nature"). Fifth, apart from being temporarily restrained by handcuffs, Defendant does not allege that agents used physical coercion to obtain his consent. See United States v. Strache, 202 F.3d 980, 986 (7th Cir. 2000) (finding voluntary consent when "police did not badger [defendant] for information or consent, nor physically abuse or pressure him"). Sixth, Defendant was not in custody, and even if he had been, that does mean his consent was involuntary. See Renken, 474 F.3d at 987 ("[A]

14

consent to search can be voluntary—and therefore Fourth–Amendment–compliant—notwithstanding the fact that it was given while a defendant was in custody without having received Miranda warnings.").

In addition, Defendant argues that his consent was not voluntary because the agents threatened to obtain a search warrant and stated that it was unnecessary for them get Defendant's consent. "An empty threat to obtain a search warrant may render consent involuntary, but if 'the expressed intention to obtain a warrant is genuine…and not merely a pretext to induce submission, it does not vitiate consent.'" Knope, 655 F.3d at 654 (quoting White, 979 F.2d at 542). Here, the agents had probable cause to obtain a warrant to search Defendant's house. Before signing the two ATF consent to search forms, Defendant told agents that he had marijuana and cocaine in his house. Dkt. 33, Ex. C ¶ 5. "Probable cause means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." United States v. Hill, 818 F.3d 289, 294 (7th Cir. 2016) (citing Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)). Furthermore, because the agents had probable cause they were "under no constitutional duty to call a halt to criminal investigation." King, 563 U.S. 452, 467 (2011); see also United States v. $304,980.00 in U.S. Currency, 732 F.3d 812, 820 (7th Cir. 2013) ("[P]olice officers do not act unreasonably by failing to halt their search every time a consenting suspect equivocates.").

The request for Defendant to sign the two consent to search forms was done out of an abundance of caution and as part of the agents' investigative procedure. Once Defendant told agents that there was marijuana and cocaine in the house, consent to search was not required. See Hicks, 650 F.3d at 1064-65. By extension, Defendant's argument that he revoked his consent to search before the agents found the marijuana and 95 grams of cocaine, but after informing the agents of the existence of the contraband, is futile.

15

### III. CONCLUSION

Therefore, after considering the above factors and the totality of the circumstances, the Court concludes that Defendant was not subjected to an unlawful Terry stop, and that he voluntarily consented to the search of his apartment. Even though Defendant was not Mirandized, requests to search do not fall within the scope of Miranda. Defendant signed two consent to search forms that informed him of his rights. Defendant was a mature adult who, without any indication of physical or psychological coercion, voluntarily cooperated with the agents during an interview about Godinez. Moreover, before signing the forms, his statements to the agents created probable cause for the agents to search independent of consent. For these reasons, the Court denies Defendant's motion to suppress.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: February 1, 2019